Good morning. My name is Eric Glitzenstein. I am counsel for the Plaintiff Defenders of Wildlife, and with the Court's permission, I will endeavor to save a couple of minutes for rebuttal. To frame what we think are narrow but important issues under the Endangered Species Act, it may be helpful, at least from the plaintiff's standpoint, to specify what we think this case is not about. We don't think this case raises some general policy question about whether threatened tortoises are more important than renewable energy projects. As the government has acknowledged, there are many places that these projects are constructed that don't involve occupied habitat of a threatened species. In fact, the second thing in this case is, at least at this juncture, not about... Any solar farm that didn't involve a conflict over environmental law? I think there were many solar farms, and this is obviously outside this record, but... I'm just trying to understand this conflicted viewpoint here. And I've spent a lot of time actually looking at some of this, Your Honor, so it's outside the record, but doing the kind of work that Defenders does and that I do, there were many degraded areas, including on Bureau of Land Management lands, that don't involve the conflicts with at least listed endangered or threatened species. They may involve other questions, but they're far more degraded. And I think the critical thing about this case is that this is occupied habitat by a threatened species. The second thing I would say that this case is not about at this juncture is whether this project is going to proceed. It's proceeded. The project, in fact, has been constructed. And so the narrow question that remains in this case... I'd like to say we agree with you on any part of your argument. What relief can we grant at this point, since the project has been constructed, that would provide any relief to you? Yes, Your Honor. And in case it answers that question, and I just want to give the citation, and I don't want to answer it more specifically here, is Center for Biological Diversity v. Bureau of Land Management decision from this court, 698 F. 3rd, 1101, which involved the constructed... 698 F. 3rd, 1101, Ninth Circuit case from 2012, which involved the constructed natural gas pipeline. And in that case, the court held, and, in fact, it wound up remanding a biological opinion, although the pipeline had been constructed, and noted in a footnote, I think it was footnote 2 in that opinion, that there were additional mitigation measures that could be adopted or certainly considered after the biological opinion was reevaluated. In fact, in that case, there were somewhat similar, I think, concerns that led the court to send the biological opinion back. And let me give you a very concrete example of actually two things that could happen here. As Your Honor knows, we've raised questions under both the jeopardy and the critical habitat part of Section 7. We've also raised questions about whether or not what's called the re-initiation trigger for doing new consultation. If it turns out that this corridor, which everyone acknowledges is going to be constrained by the project, it turns out to have greater impacts. So just one very concrete example of something that could happen on remand is for the Fish and Wildlife Service to adopt clear re-initiation criteria for determining when this project is having an adverse impact on the species, such that you would do a further analysis of whether additional remedial measures would be necessary. The bottom line, we don't have any mootness issue. If we agreed with you on some aspect of this, there may be something that would happen as a result, and it wouldn't stop the project, which is already completed. That's correct, Your Honor. You finished the list of things that you would want to happen. Well, I think the relief, just to be specific about a response to Judge Smith's question, is a remand to the Fish and Wildlife Service. This is an administrative record review case, as the court knows. To do what specifically? So the remand would be basically to reconsider aspects of the biological opinion. So first of all, as Your Honor knows, we've argued that this biological opinion specifically made a jeopardy finding contingent on a determination that remedial measures could be adopted in the event that the corridor is constricted to the point where it really is impairing the survival and recovery of the species. We believe the biological opinion is just explicit about that. So if, in fact, there is a remand, the Fish and Wildlife Service could, at one level, say what the government has basically come in and said in this court, which is not in the biological opinion, and that is, well, that's not really crucial to our analysis. We've decided that this either-or framing that we put in the biological opinion is something we're going to distance ourselves from. Isn't that really the key on that point? Because under our National Wildlife Federation versus National Marine Fisheries Service, we indicated that unless you're dealing with certain immediate negative effects, the fact that there might be some contingent but highly unlikely circumstance in the future that would require a reevaluation, that does not render the biological opinion unreliable. Isn't that correct? I think that is a correct statement of what happens when you are saying we think it's unlikely we're going to have a problem. And isn't that what happened here? I don't believe it is, Your Honor. And if you look at excerpts of the record, page 118, this is our excerpts. This is the conclusion of the biological opinion. And the conclusion is, to summarize, we have concluded that the proposed actions are not likely to appreciably diminish reproduction, numbers, or disturbance of the desert tortoise in the action area, or to appreciably impede long-term recovery of the desert tortoise. The government harps on that sentence. The next sentence says the following. Integral to that conclusion is our expectation that the reduction in the width of habitat east of the Silver State South Project is either unlikely to degrade demographic or genetic stability in Ivanpah Valley, or that we will be able to detect degradation of those values and implement remedial actions if necessary, without then providing any indication of what those remedial actions might be. Now, in the normal ---- It may not depend on what they found. It may depend in part on what they find, but I think the critical point is there may well be planning that you can do today that would be extraordinarily valuable if this or in the either-or scenario comes to pass. So, for example, Your Honor, in terms of other habitat that you might want to preserve or try to preserve on BLM lands, if, in fact, this monitoring that they say is going to be implemented over the course of years, if not decades, reveals that, sure enough, we have genetic bottleneck now, or we have demographic impacts, and these are closely related, but they're not exactly the same. One is a population kind of impact. One is a genetic impact. If, in fact, the monitoring demonstrates that we've got one of these bottlenecks going on, there may well be habitat that you should basically be taking a look at now that you could put into some kind of protected stay, or there may be translocation efforts that take years in advance to plan for. So this is not just me talking in terms of what makes sense as a commonsensical matter, given the way they formulated the biological opinion. This is the plain language of the Endangered Species Act. But, Counsel, I just came back from a judicial seminar where they talked about the modeling and assumptions made in the Environmental Protection Agency, and it's filled with assumptions because there's no other way to know certain things because they haven't happened yet. I would have thought that you would have been really happy that they had provided this extra level of, if you will, engagement in the unlikely event that something were to happen. We wouldn't know for some time. You talk about genetic changes over time. It's almost Darwinian in a way. I'm having trouble faulting them for saying, look, this is what we know now. We're satisfied that this is not going to create a problem. But we're going to take this extra step. We're going to monitor this very carefully, and if we find down the road that there's something that's happened, we will take remedial action. How do you fault that? I mean, you know, unless you're just trying to stop the project, which is too late now, why do you object when they're doing that extra little bit to actually protect the turtle in the event there are such changes? Your Honor, I think the premise of your question, and just to answer your question, we don't fault them for the monitoring part. But the premise of your question, as I understand it, is that the biological opinion said we don't think there's going to be a problem. That's my reading. But we're going to do the sexual monitoring. That's my reading. Well, and I would urge Your Honor to look specifically at the page that I just articulated, pages 117 through 118, 114, 102 through 103 of our excerpts of the record. I know Your Honor is familiar with Section 7. I am. And the standard biological opinion is written, I think, in the way Your Honor just stated, which is we don't believe there's a jeopardy situation. But as a protective matter, we'll take a look and we'll do this. In fact, the reinitiation obligation imposes that. I think a fair rule. I wrote a case in Northern Securities involving, I think it was Montana somewhere, where they had a mining project where everything was based on an assumption. There were no tests. There was no anything. And we found that didn't make it because there was simply no evidence that they actually had looked at it. This is very different here. They really did. Was it five years they've spent on this project so far? And they went back again and they did all these testing. It's hard to imagine what more they could have done in this biological opinion that they did other than change the language, which you all are really good lawyers, and I know you read these things very, very carefully. But when you look at the totality of it, you know, what more could they have done given the current understanding of the circumstances? I appreciate that, Your Honor. I really do think, and again, I'm sure Your Honor already has, but I urge you to take a close look at how they formulated the conclusion, which I really do think is different than most biological opinions you may have seen before, where they really said at the end of the day – They write like lawyers giving a securities opinion. Well, they said we really don't know what's going to happen, that we have these grave concerns about whether this corridor is wide enough, and therefore we're making a call to let it go forward. We're going to monitor. And what we're saying very concretely is under those circumstances, it's not consistent with the plain language of the Endangered Species Act in this kind of situation, which, again, is you have to ensure that it's not likely to jeopardize. If you don't articulate at some level what those remedial measures can be so that you can start to plan, even what the Fish and Wildlife Service acknowledges is the very distinct possibility that this corridor may now have been constricted so much. What I'm saying, though, is that in order to qualify under Section 7, it's certain. And if you don't know that it's certain, you can't make the determination. What I'm saying is that in this setting, it is impossible to know exactly what's going to happen because you're talking about genetic changes in these species to accommodate narrowing corridors, the like. A very laudable and important objective, but unless everything is going to grind to a halt, and perhaps that's some people's desire, the reality is you have to say, okay, based upon the current assumptions, which is a lot of data, and the current science, we think this is the best that we can do. We're going to have a little contingency plan to keep watching it. Why does the law require more? What case can you cite me to that says it's different? Well, I think the National Wildlife Federation case from this court, I think the Sierra Club versus Marsh case. I think the case I just brought up at the beginning, the Center for Biological Diversity Ruby Pipeline case, all say that if the no jeopardy conclusion hinges even in part on future measures, you have to make some effort, a reasonable effort. But that's not the case in the first place. That's what I'm having trouble with. I think that the other is simply, if you will, a prophylactic measure to protect the tortoise in the future in the event things change from what the determinations were made at right now. And, Your Honor, if they had actually said it that way in the biological opinion as opposed to recasting it that way. They need your language. They didn't say that. They said integral to our conclusion was these remedial measures. Could I just add another point about this, Your Honor, because I appreciate the dialogue, but I do also think that it's critical even to your own analysis that there has to be some clear trigger for when they would reinitiate consultation. And as we pointed out in a brief, if you look clearly at the biological opinion itself, it says we're going to monitor and we will be able to detect whether there is genetic or demographic change. Then it says if those changes are attributed to this project, then we will look at and refute the remedial measures. A very modest request we're making. And given everything Your Honor just said, I think this is totally consistent with even what Your Honor has said. How do you predict the genetic change? You say, well, you've got this gene and this chromosome changing. You don't know what's going to happen. Well, actually, they've said that. They've said they're going to know when, in fact, there have been genetic changes. They actually have it very specifically set forth in the opinion itself. Well, again, the crucial concern that we have in terms of reinitiation, Your Honor, is they say that we will use these factors to determine whether or not there has been a change. But then they say if the changes are related to the Silver State South and State line projects. And if you look at the record citations we gave, BLM went back to the Fish and Wildlife Service and said, can we have further clarification of how we measure whether or not the change is due to those projects? And there was never any answer to that. And we would certainly at this stage be a lot more comfortable, and I think it would be consistent with the law, even as Your Honor has articulated it, to have some effort to say here's how we will know whether those changes have been due to these projects so we can impose additional measures. Are those knowable at this point? Excuse me, Your Honor? Are those criteria knowable? I think it's something for the agency to attempt to articulate. What if they say we can't say right now because they're on note? They can try that, Your Honor, but they haven't addressed the issue in this record. And I think being the... Have you, given the fact that they can't tear down these, Bill, have you sat down with the Fisheries and Wildlife Service and tried to work out language that would be acceptable to both? Your Honor, we would be happy to do that if this matter were remanded to the Fish and Wildlife Service. At this point, it's been in litigation, so we haven't been able to do that. But we have, I don't know the right word for it, we have mediation. And, Your Honor, if this matter... If this is what you're complaining about, that reasonable people might be able to come to some resolution of it without a remand. Well, a remand we think because they haven't addressed what's crucial to ensuring that there's not likely jeopardy would be the appropriate vehicle for doing exactly what Your Honor just said. Because on a remand, we could participate. We could bring scientists who know about these things. We might be able to work this out. If we don't have that, we're not going to get the time of day on this project at this point. If I could just spend one moment on the critical habitat point, which we haven't talked about, because I think this one really is, in some respects, perhaps more clear-cut. We gave you the fence hypothetical in our briefs, which we think has never been adequately answered. Their position is if you draw a fence all the way outside critical, you know, an inch outside critical habitat, you never look at whether... And it completely cuts off the species' ability to use the critical habitat. You don't analyze whether there's an adverse modification or effect on the critical habitat. Because you have so little time, let me just say, I say I agree with you about the critical habitat on this point. But given the relatively de minimis nature of this connectivity issue, is that a harmless error? I don't think so. I think Gifford-Pinchot adopts a very narrow view of harmless error in this context. And the second reason is you could have an impact on the recovery potential of the critical habitat unit, Your Honor, that doesn't rise to the level of an impact on the species as a whole. The biological opinion admits that there will be an adverse effect on recovery. But it has no analysis on whether that rises to the level of an impact on the recovery unit. And Gifford-Pinchot says, I think that is the law of this circuit under Gifford-Pinchot, that you have to have a separate critical habitat analysis because it's a different kind of analysis than a jeopardy analysis, which is the only thing that's in the opinion. And let me just, if I could add, Your Honor, they certainly did not say a de minimis effect. I think a fair reading of this biological opinion is that we're very concerned about the possible effect, even if we ultimately read it as not a jeopardy situation. It certainly suggests point blank that there could be an adverse impact on recovery. That's where analysis of potential critical habitat effect comes in. So I don't think you could assume, Your Honor, if I could just finish because I think this is a crucial point, I appreciate your bringing it up. I don't think you could assume that they would reach the same answer if you were to remand, and I think that really is ultimately the harmless error question. And, you know, for all the reasons we set forth in our brief, we don't think their position makes a lot of sense under circuit precedent, and so we do ask that on that issue that there be a remand. Your feelings if we remand? It would not hurt my feelings, Your Honor. Thank you very much. Thank you. Good morning, Your Honors. From the power project. I don't know. The government or from the power project? From the United States, Your Honor. Very good. And I'm going to take 15 minutes. Climbing time? Yes, I was going to take 15 minutes of the time, and Mr. Kaplan for the interveners will take five. Okay. Good luck with that. It's our experience that it's very, very difficult, but I trust that your body language to each other will signal the appropriate moment for the handoff. I will try to watch the clock. Good luck. Thank you. May it please the Court, my name is Varu Chilakamari for the Federal Appellees. Now, I think the issue here is whether the biological opinion is reasonable. The biological opinion represents a scientific judgment by the Fish and Wildlife Service that this project, including the impact on the corridor, is not likely to appreciably impede the recovery, and the opinion itself actually makes the higher threshold more protective finding related to recovery in this case. Now, I want to address a couple of the issues that counsel has raised. First on the either-or sentence. Actually, when you look at the either-or sentence itself, and there's two reasons why I don't think that this sentence invalidates the biological opinion. First, you look at the sentence itself, and then you look at the context. In the sentence itself, it's not talking, it doesn't say either there's going to be no jeopardy or if there is jeopardy, we'll fix it later. What the sentence is talking about is something far short from jeopardy. It's talking about any change in the demographic or genetic stability at all in the tortoises that they'll be able to detect those changes. Now, that does not even talk about populations being permanently severed. It's certainly not talking about jeopardy itself. Now, when you look to the context of the opinion, and I think, Judge Smith, Your Honor, as you said, the opinion itself, it casts the sentence as taking into account uncertainty in science. The Fish and Wildlife Service was open and acknowledged that this area of tortoise biology was not fully developed, and if future science shows that future remedies are necessary, then that's something that they're going to employ. But on the page that the reality is that the science in many of these areas, particularly with respect to endangered species, is evolving. There's a lot of research undertaken right now, but the reality is, if I understand it correctly, that most scientists cannot say with specificity that, for example, if you've got salmon coming down a particular river in a certain amount of silt, that over a certain period of time they'll develop different kinds of gills and therefore change them, because it takes a long time to do that. So what they do is they run models and they prognosticate and they say that it's our opinion that, but they don't know that. And what I find in these biological opinions is that they're just filled with assumptions, but there's no other way to get there because there's no science to back it up. It doesn't mean it's wrong. It's just it's the best we've got. And isn't that the position really of the government here is this is the best science there is out there. We've met. We've consulted. We've done the best we can. We think this is right. We're relying upon it. We don't think it's going to change. But if it did, this is our backup. Is that your position? Yes, Your Honor, and that's the standard. The standard, the court does not require that the service have to justify its decisions with 100 percent confidence. What it has to do is look at the best science that's currently available today, and it did that. And not only that, but it made the findings, the language in the opinion. There's no need for a remand here because the language in the opinion itself, it notes that. On page 118 of the ER, beyond once you get past that either-or sentence, the service itself points to and enumerates a list of other reasons that support its decision. For example, it says that the solar project footprint will take less than five one-hundredths of a percent of this recovery unit. It goes on to say that the corridor is going to be able to accommodate a lifetime utilization area of the tortoise. It also points to the numerous mitigation measures which the service believes will enhance connectivity, measures that total over $7.2 million in this case. So when you look at the entirety of the biological opinion, it's clear that not only is a sentence not talking, it's not dispositive on the question of jeopardy, but it's also indicative of the conclusion that the biological opinion rests on a number of mitigation measures that have already gone into effect. Now, if I could also turn to the question of the reinitiation notice, and to Your Honor's question about whether or not there's any meaningful relief here. The government agrees that the law and the circuit, when you have a constructed project, there could be effective relief with mitigation, and so it technically may not be moot. However, this might be a case to consider prudential mootness, and I say that because the question is really, is there effective relief? Now, theoretically, there might be mitigations, but in this context, in this case, what they're asking for is for the service to reopen a process, but that process is actually ongoing. It's ongoing because of the extensive monitoring that's mandatory and has already begun, and that monitoring program is quite extensive, far from being vague and not explaining how they're going to. Do you know of any cases in this area that have found prudential mootness? I don't think that this circuit has found so, Your Honor. There's the Maldonado v. Lynch case, I think was an on-bank decision in 2015, and it was an immigration context. It did not find prudential mootness, but it talked about the doctrine. What good would that do here because, as we all acknowledge, there are these reinitiation projects that are out there as possibilities, and it's almost like it's capable of repetition, that same concept that you would find in some other context. I don't understand why it would make any sense to find any prudential mootness in something like this because there is an ongoing review. These folks are very committed to the environment and will be monitoring, as they should. So it seems to me the mootness issue probably doesn't fly very well. I don't think that you have to get there, Your Honor. That's only if you don't want to exercise your remedial authority. But I note that because what they're asking— Mootness and bankruptcy is one thing, and the environment, not so much. Well, I think that it turns on kind of what is there left to do. And in this case, the monitoring that's in place is going to tell us whether or not there's any changes at all in the tortoise population, demographic or genetic. And if there are any changes that are related to the project, then the Fish and Wildlife Service will reopen the entire consultation process again and assess what to do. Now, counsel says, well, that's not specific enough. We don't know how the service will decide whether something is related to the project. But actually, the reinitiation notice here is very specific. And first, I want to note that biological opinions don't have to contain reinitiation notices for new information. That's because the regulations themselves set forth the criteria when new information should trigger it. But in this case, the service took one step further, and it noted at least one example of when it would reinitiate consultation. And it explains that it's going to do this extensive monitoring study. There have now been 13 plots in the Ivanpah Valley. One plot is at the location of the solar project. Two plots are at either end of the corridor. And 10 other plots are at different locations in the Ivanpah Valley, areas of development and also areas of control sites. They're going to be regularly, three to five years, taking genetic samples of the tortoises in those plots. They're also going to be using radio tags to monitor the fine-scale movement of the tortoises. So you have both the short-term and the long-term changes that are being monitored. And if the service, by comparing those plots, sees that there's a change in this area that's related to this project, then it's going to reopen consultation. Is this information available to, for example, to your adversary? The monitoring information? Yes, Your Honor. The U.S. Geological Survey is conducting this. It's their job to put out this kind of information, and they will be publishing that information publicly available. At this point, there's only been baseline monitoring that's been done. But the information will be available. And I want to note that the biological opinion itself talks about this extensive reinitiation process, but also for more information and to see the actual plots and to see that they're going to know whether something is happening in this area or some other area, at the SER, the Intervenor SER, page 96, it shows you the locations and it talks in detail about that study. Now, if there are no other questions on the no jeopardy provision, I'd like to turn to the critical habitat question. So on the question of critical habitat, the appellant has drawn up this hypothetical fence example. But first of all, that is not this case. Here, the whole point of the biological opinion was to assess population connectivity and to ensure that this project was not going to be functioning like a fence. They concluded that there would be continued tortoise occupancy and movement through this corridor. There's not going to be a fence here, and there's certainly not going to be a fence around the critical habitat unit, which is miles away from where this project is. I think it's uncontested in this case that not only is the project miles away, but the project will not have any direct or indirect effect. At least by my reading of it, if the corridor width were reduced, there may be some connectivity effect to that. My question is, even if that's true, is there a concept of harmless error, if you will, in this area of law? And if so, what case law could you point us to that effect? Harmless error in terms of the biological opinions assessment? Yes, in terms of the connectivity and the critical impact analysis. So we make this point in our brief, Your Honor, that in this case, even though the service didn't talk about adverse modification of critical habitat, if this court were to give any weight to this fence hypothetical, and if the court required the service to analyze hypothetical fences outside of critical habitat, this case would still not be on the agreement, because here the Fish and Wildlife Service analyzed the project to make sure that it didn't function like a fence, and therefore you don't get to this question of whether the habitat has actually been devalued. What gives us the authority to, I'm using the term harmless error, maybe that's not the proper one, but basically just to say, what do we do with that? I think the general harmless error law, Your Honor, would apply. We cited a couple of cases that aren't specific to this area, but just the general idea that the agency's decision and the reasoning of the agency's decision shows you that there's no different result that would ensue in this case. I think, you know, the Supreme Court in the Shinseki v. Sanders case, again, not an environmental case, but it was a case involving the Department of Veterans Affairs, and that case talked about harmless error in the administrative law context. Are you suggesting that we can import into the environmental area the concept of harmless analysis in some limited circumstances because in the environmental, rather, in the administrative law area, there are cases that substantiate that? Is that your position? It depends. I think in this particular case you can because here, even if you accept this hypothetical fence, you have the service that made this judgment that you will not have populations that are severed. Once you don't have that effect, even under their analysis, you don't then analyze how the ______. Would we do it this way or would we say, like, for example, under Lands Council v. ______, we defer to you all, you give us your best analysis. If something's missing, unless it hasn't been analyzed and a determination made, which may or may not agree with what the environmental community alleges, that if we ______ analysis, that's all it takes. Is that basically what you're saying here? The job of the service is to make its best scientific judgment based on the current science, and as long as it's reasonable and this court can discern its conclusion from the record, then that's sufficient. And the same Lee Water Authority case that we cite in our brief, that also talks about, you know, even if there are some issues with the actual language of the opinion, that you can do that. I want to close up on the critical habitat, if I can, and note that, again, we don't think this is not like a fence, but the actual statutory construction that the appellants are pressing for is far more expansive than what the statute allows. Now, the statute and the regulation, they clearly require a two-step process, and I want to take a minute just to walk the court through that. The regulations define destruction or adverse modification as a direct or indirect result that appreciably diminishes the value of the habitat. So you have to have both. You first have to have some kind of direct or indirect alteration, then you look at the conservation value of the habitat. What the appellant is asking for this court to do is to take out, read out, direct or adverse that language from the regulation and go straight to assessing the conservation value of the critical habitat in the abstract. That's not only contrary to what the language of the regulation say, but they're asking this court to treat the corridor as if the secretary had designated the corridor as critical habitat when it did not, and we think that that not only leads to problems in how you analyze it, but it conflates the jeopardy and the critical habitat prongs. Your Honors, the biological opinion in this case is reasonable. It was dealing with a challenging issue of science, to be sure, but it was reasonable, fully supported by the record, and the district court in this case got it right. We ask that you affirm the district court. Thank you. Your colleague is probably going to be very happy. Could you give him an extra 36 seconds? I'm George Kaplan. We represent the intervener appellees. Actually, the concept of harmless error is built right into what the service did. In other words, I don't think we were asked to import the notion of harmless error into a case like this when the service has basically first concluded that it is not likely to jeopardize the species on the one hand, and on the other hand, in the unlikely case that it might, here are some of the advantages that we think would be helpful. Counsel, did you use the term harmless error, or is there a difference if we agreed with you? Well, I don't think that what we're doing here involves harmless error as such, except to the extent that what we're dealing with is uncertain science, really. I gather what I'm understanding you to say is that it may not be harmless error, but given what it requires, we've investigated it, we've done the best we can, we discount what your adversary is saying, and because we think there is nothing that's going to come of it, that is in fact harmless error. Is that essentially what you're saying? Well, yes. I mean, it is. As the applicant, we downsized this project. I mean, we should all understand that in 2010, this project was substantially downsized. The actual acreage that the project takes was vastly reduced by 37%. The actual output of the project was reduced by 100 megawatts, which was very substantial. It was reduced from 350 to 250 megawatts. It was moved to the farthest western point of the site that it could be moved to, and I don't know if it came through as clear as it might have, but the actual project is two to three miles away from the critical habitat. So this fence analogy is, frankly, strange. It's not like this project was built adjacent to, I mean literally adjacent to, or on the critical habitat. It's not, and it's not only not near it, but it's a passive project. It's a benign site, meaning it's a sun collector. It's not polluting. It's not a public housing project where kids or off-road vehicles would be going into critical habitat. So you really don't have any direct or indirect alteration of the critical habitat at all. That's not what this project's about. So the only real issue are really biological issues, connectivity, future population size. That's why our client was so willing to fund the surveys, to participate and continue to participate in this project in a very constructive way. So, again, I think that the government did a very careful job here. We've spent years, as the court pointed out, pulling this project together and retaining the value of both sides of this equation, one, renewable energy, the other, the habitat and species. Your adversary doesn't want you to tear it down. So, you know, what is now your interest? Well, we think that what has been done is complete. In other words, the government has analyzed this project. It has used best available scientific evidence and information to put this project together as it did. And in the unlikely event that things change, there is a monitoring program in place. It actually functions. It's doing what it's supposed to do. And, you know, these are actually not large animals. They don't cover a lot of territory. And it will take years to figure out whether there are any adverse effects. But if there are, we will know it when we see it because we will find that there is less genetic connectivity or the population size will decline. And it will be obvious that further action may be necessary. And we're willing to do that. We're participating that way. Can I ask, just out of curiosity, why did you choose this place? The sites are picked because of the amount of sunlight. And they're picked in – and frankly, we try to pick them so as to be free of as many geographic constraints as possible. Do you have a question? Thank you, counsel. Thank you very much. Your learned opponent has a few minutes. If I could just give some citations with which to answer the critical habitat, harmless arrow question. Okay. 59 FEDREG 5834. Wait, wait, wait. 59. 59 FEDREG 5834, which is the tortoise designation, specifically says that the loss of a single human may not jeopardize the continued existence of the species, but it may significantly reduce the ability of critical habitat to contribute to recovery. And on the bottom of that page, specifically talks about actions outside of critical habitat having an adverse effect within critical habitat that has to be analyzed. Gifford Pinchot, Your Honor, directly addresses the harmless arrow issue in this context and specifically says that you have to be convinced that the procedure would not have changed at all in analyzing the impacts. Here, if you look at this biological opinion, although they included critical habitat in the action area, which is defined as the area where there may be direct or indirect effects, there is no analysis at all, even though the opinion admits the following at page 113 of the excerpts of the record. The Silver State project is likely to reduce connectivity within Ivanpah Valley. Consequently, the proposed project is likely to impede recovery of the desert tortoise. Now, they reached a no jeopardy conclusion. We talked about that. Critical habitat is a separate analysis under Gifford Pinchot, under their own rule that they recently issued, which we put in our reply brief. This cannot be a harmless arrow situation. I respectfully submit there should be a remand for that issue to be addressed. If new mitigation measures are developed, those can be incorporated, and then we can protect the tortoise better and also keep this project functioning. Any other questions? We thank counsel and all of you for your learned argument. We really appreciate it. It's a very technical area of law, and it's nice to have such well-qualified and informed lawyers helping us. So the case just argued is submitted. Thank you, Your Honor. The court is going to go into just we're going to adjourn, but I want to acknowledge the presence of a number of UCLA law students who are here. We're going into conference to decide the cases, and then we will come back out. In the meantime, we have law clerks here who are going to entertain you. They have some dances and a little music that they're going to provide for you, and then we'll come back out shortly. Thank you all. The court stands in adjournment.
judges: M. Smith, Owens, Korman